UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

NINE IRAQI ALLIES UNDER
SERIOUS THREAT BECAUSE OF
THEIR FAITHFUL SERVICE TO
THE UNITED STATES,

      Plaintiffs,

         v.

HON. JOHN F. KERRY, et al.

      Defendants,

Civil Action No. 15-300(GK)

---

## MEMORANDUM OPINION

### CONTENTS

I.      BACKGROUND...................................................... 4

  A.   The Special Immigrant Visa Programs............................ 4

  B.   Plaintiffs' Circumstances.................................... 10

II.    STANDARD OF REVIEW........................................... 18

III.  ANALYSIS.................................................... 20

  A.   Plaintiffs' Motion for Leave to File Supplemental Declaration 20

  B.   Counts 3-6: Failure to Adjudicate Plaintiffs' Applications... 22

    1.  Standing ...................................................... 24

    2.  The Doctrine of Consular Nonreviewability ..................... 28

    3.  Judicially Manageable Standards to Enforce a Non-discretionary
       Duty.......................................................... 52

    4.  The APA and the Mandamus Act .................................. 59

  C.   Counts 1 & 2: Failure to Protect............................. 61

IV.   CONCLUSION.................................................. 67

Plaintiffs in this case are Iraqi and Afghan citizens who incurred great risks to themselves and their families through their service to the United States during the military operations in Iraq and Afghanistan known as Operation Iraqi Freedom and Operation Enduring Freedom. In order to avoid ongoing threats to their personal safety, Plaintiffs hope to immigrate to the United States pursuant to Iraqi and Afghan Special Immigrant Visa programs that Congress authorized to provide refuge for Iraqis and Afghans who face or have faced serious threats because of their past faithful service to the United States. See Refugee Crisis in Iraq Act of 2007 ("RCIA"), 8 U.S.C. § 1157 note at §§ 1241-49; Afghan Allies Protection Act of 2009 ("AAPA"), 8 U.S.C. § 1101 note at §§ 601-02.[1] Because of the ongoing risk of reprisal they face, Plaintiffs have been granted leave to proceed by pseudonym in this action.[2] See Order Granting Motion to Proceed by Pseudonym [Dkt. No. 2].

Plaintiffs contend that Defendants, Secretary of State John F. Kerry, the Department of State, Secretary of Homeland Security Jeh Charles Johnson, and the Department of Homeland Security (collectively, "Defendants" or "the Government"), have failed to

---

[1] The RCIA and AAPA are codified as notes to 8 U.S.C. §§ 1157 and 1101, respectively. The Court cites to provisions of these acts with the relevant act's abbreviation and section number (e.g., RCIA § 1241) throughout.

[2] The relevant pseudonyms and factual distinctions in each of the Plaintiffs' situations are set forth below.

make reasonable efforts to protect Plaintiffs or remove them from Iraq and Afghanistan, and have failed to finally adjudicate Plaintiffs' Special Immigrant Visa applications within a reasonable period of time. Amended Compl. ¶¶ 205-54. Plaintiffs' Amended Complaint seeks an order compelling these actions pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1), and the Mandamus Act, 28 U.S.C. § 1361.

On September 1, 2015, the Government filed its Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim ("Gov't's Mot.") [Dkt. No. 36]. It contends that Plaintiffs lack standing to pursue their claims and have failed to state claims upon which relief can be granted because, among other reasons, Plaintiffs have received final refusals of their applications. On September 25, 2015, Plaintiffs filed their Opposition [Dkt. No. 43], and on October 2, 2015, the Government filed its Reply [Dkt. No. 45].

On October 23, 2015, Plaintiffs filed a Motion for Leave to File a Supplemental Declaration in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss [Dkt. No. 48] along with a copy of the Supplemental Declaration [Dkt. No. 48-1]. On November 6, 2015, the Government filed its Response [Dkt. No. 49]. On November 9, 2015, Plaintiffs filed their Reply [Dkt. No. 50].

Upon consideration of the Government's Motion to Dismiss, Plaintiffs' Opposition, the Government's Reply, Plaintiffs' Motion for Leave, the Government's Response, Plaintiffs' Reply, and the entire record herein, and for the reasons stated below, Plaintiffs' Motion for Leave to File a Supplemental Declaration shall be **granted** and the Government's Motion to Dismiss shall be **granted with respect to Counts 1 & 2 and denied with respect to Counts 3-6** (except insofar as those claims relate to Alpha, Bravo, and Delta).

I.      **BACKGROUND**

        A.      **The Special Immigrant Visa Programs**

        In recognition of the grave dangers faced by many Iraqis and Afghans who have assisted United States' military efforts in their countries, Congress established Iraqi and Afghan Special Immigrant Visa ("SIV") programs, enacting the Refugee Crisis in Iraq Act of 2007, RCIA §§ 1241-49, and the Afghan Allies Protection Act of 2009, AAPA §§ 601-02. Under the Iraqi SIV program, an SIV may be granted to an applicant who:

        (A) is a citizen or national of Iraq;

        (B) was or is employed by or on behalf of the United States Government in Iraq, on or after March 20, 2003, for not less than one year;

        (C) provided faithful and valuable service to the United States Government, which is documented in a positive

-4-

recommendation or evaluation . . . from the employee's senior
supervisor or the person currently occupying that position,
or a more senior person, if the employee's senior supervisor
has left the employer or has left Iraq; and

(D) has experienced or is experiencing an ongoing serious
threat as a consequence of the alien's employment by the
United States Government.

RCIA § 1244(b)(1). Spouses and children of individuals who meet
the RCIA's requirements may also receive SIVs. RCIA § 1244(b)(2).

The AAPA includes substantially similar provisions that offer
SIVs to citizens or nationals of Afghanistan employed by or on
behalf of the United States Government (or in certain
circumstances, the International Security Assistance Force) in
Afghanistan, on or after October 7, 2001 for not less than one
year, as well as their spouses and children. AAPA § 602(b)(2)(A)
& (B).

In both the RCIA and the AAPA, Congress instructed Defendants
to "improve the efficiency by which applications for [SIVs] under
[the Iraqi and Afghan SIV programs] are processed[.]" AAPA
§ 602(b)(4)(A); RCIA § 1242(c)(1). Congress emphasized this point
with the directive that SIV applications shall be "processed so
that all steps under the control of the respective departments
incidental to the issuance of [SIVs], including required

-5-

screenings and background checks, should be completed not later than 9 months after the date on which an eligible alien submits all required materials to complete an application for such visa." RCIA § 1242(c)(1); AAPA § 602(b)(4)(A) (repeating identical language). Mindful that particular cases might present national security risks not present in the average SIV application, Congress added that "[n]othing in [the] section [quoted immediately above] shall be construed to limit the ability of [the Secretary of State or Secretary of Homeland Security] to take longer than 9 months to complete those steps incidental to the issuance of such visas in high-risk cases for which satisfaction of national security concerns requires additional time." RCIA § 1242(c)(2); AAPA § 602(b)(4)(B) (same).

Both statutes also provide that "[t]he Secretary of State, in consultation with the heads of other relevant Federal agencies, shall make a reasonable effort to provide an alien described in this section who is applying for a special immigrant visa with protection or the immediate removal from [Iraq or Afghanistan], if possible, of such alien if the Secretary determines after consultation that such alien is in imminent danger." RCIA § 1244(e); AAPA § 602(b)(6) (providing same treatment for protection

-6-

or removal of applicants from Afghanistan with only slight differences in phrasing).[3]

The RCIA and AAPA require Defendants to issue reports to Congress regarding the number and status of SIV applications and improvements to the process for considering SIV applications. See RCIA § 1248(a), (f); APAA § (b)(11). Many of these Joint Reports from the Departments of State and Homeland Security (referred to throughout as "Joint Reports"), which Plaintiffs summarized in their Amended Complaint and submitted as exhibits to their Opposition, provide insight into the process by which Defendants review Iraqi and Afghan SIV applications. See Amended Compl. ¶¶ 44-50; Pls.' Exs. L-W [Dkt. Nos. 43-4 through 43-15].

As each of the Joint Reports states, "SIV applications move through 14 steps, in the following four stages: Chief of Mission ("COM") Application Process; Form I-360 Adjudication; Visa Interview; and Visa Issuance." E.g., Pls.' Ex. L at 2. Chief of Mission Approval (which is granted on the basis of the Chief of Mission Application and is referred to by the Parties as "COM

---

[3] "The Secretary of State, in consultation with the heads of other appropriate Federal agencies, shall make a reasonable effort to provide an alien described in subparagraph (A), (B), or (C) of paragraph (2) who is seeking special immigrant status under this subsection protection or to immediately remove such alien from Afghanistan, if possible, if the Secretary determines, after consultation, that such alien is in imminent danger." AAPA § 602(b)(6).

Approval") is required by the APAA and RCIA. RCIA § 1244(b)(4);
AAPA § 602(b)(2)(D). Both statutes state that the relevant Chief
of Mission in Iraq or Afghanistan must "conduct a risk assessment
of the alien and an independent review of records maintained by
the United States Government or hiring organization or entity to
confirm employment and faithful and valuable service to the United
States Government prior to approval of a petition under this
section." RCIA § 1244(b)(4)(A); AAPA § 602(b)(2)(D)(i).

Once an applicant has received COM Approval, he or she must
enter the second stage of the process by submitting a completed
Form  I-360  to  the  Department  of  Homeland  Security's  U.S.
Citizenship and Immigration Services ("USCIS"). E.g., Pls.' Ex. R
at 3. If USCIS approves the petition, it is sent to the Department
of State's National Visa Center ("NVC"), and the applicant begins
the Visa Interview Process stage. Id.

The Visa Interview Process stage includes six steps of the 14
steps that make up the SIV application process -- more than any of
the three other stages. Id. In this stage, the applicant must
submit certain documents to the NVC and schedule an interview at
the appropriate U.S. Embassy. Id.

The Joint Reports uniformly describe the last two steps in
the Visa Interview Process stage (which are steps 12 and 13 of the
full 14-step application process) as follows:

12.  Applicant is interviewed by consular officer on the scheduled appointment date. Administrative processing is initiated following the interview.

13.  The applicant's case undergoes administrative processing.

E.g., Pls.' Ex. O at 3.[4]

"Upon completion of administrative processing," the applicant enters the fourth and final stage: Visa Issuance. Id. This last stage has just one step in which a "visa is issued if [the] applicant is eligible." Id. However, the Joint Reports note that by this point, "[i]n some cases, the passport or medical exam will have expired and require renewal by the applicant." Id.

---

[4] Although the Joint Reports describe "administrative processing" as a necessary step in the SIV application process that must follow the consular interview and precede visa issuance, see e.g., Pls.' Ex. O at 3, State Department regulations require consular officers to "either issue or refuse" any visa immediately "[w]hen a visa application has been properly completed and executed before a consular officer in accordance with the provisions of [the Immigration and Naturalization Act] and [that Act's] implementing regulations[.]" 22 C.F.R. § 42.81 (2015).

The United States Foreign Affairs Manual underscores this point further, stating "[t]here are no exceptions to the rule that once a visa application has been properly completed and executed before a consular officer a visa must be either issued or refused. . . . There is no such thing as an informal refusal or a pending case once a formal application has been made." 9 FAM 42.81 N1.

The apparent conflict between these general agency visa regulations and the SIV-specific Joint Reports' statement that an "administrative processing" step must precede visa issuance is discussed below in section III.B.2.a.

### B.   Plaintiffs' Circumstances

Plaintiffs' Amended Complaint brings claims on behalf of 12 Plaintiffs -- 8 Iraqi and 4 Afghan citizens -- proceeding under the following pseudonyms: Ronaldo, Alpha, Bravo, Delta, Foxtrot, India, Juliet, Alice, Hotel, Lima, Kilo, and Mike.[5]

There is significant disagreement between the Parties as to the circumstances of the 12 Plaintiffs' applications. Some of the disagreements are over the Parties' construction of the law and facts at issue in this particular case. For example, Plaintiffs contend that most of their applications have not been finally granted or refused, but instead, languish in an intermediate stage of "administrative processing." See Poellot Decl. [Dkt. No. 43-1]; Pls.' Exs. C-K [Dkt. Nos. 44-2 through 44-10]. The Government contends, counterintuitively, that while Plaintiffs' applications may still be granted following "administrative processing," the applications have, in fact, been finally refused. See Dybdahl Decl.

_____

[5] Plaintiffs' initial Complaint [Dkt. No. 3] included the claims of additional Plaintiffs under the pseudonyms Frodo, Charlie, Echo, and Golf. Frodo and Echo have since been issued visas. Gov't's Mot. at 4-5. Charlie and Golf's applications have been refused under 8 U.S.C. § 1182(a)(3)(B), which provides that individuals who have any of the various enumerated ties to terrorist activities are ineligible for admission to the United States. Id. The Parties agree that Frodo, Echo, Charlie, and Golf are no longer Plaintiffs in this suit. See generally Amended Compl.

[Dkt. No. 36-1].[6] Disagreements of this type are flagged in the paragraphs that follow and are discussed more thoroughly in subsequent sections of this Memorandum Opinion.

Other disagreements are over the Government's apparent factual mistakes. Because these disagreements appear to concern obvious errors, the Court will resolve them in this section. The Court will discuss groups of Plaintiffs collectively where appropriate and indicate when it is resolving the Parties' competing views of the facts, as it must when facts determine the Court's jurisdiction. Jerome Stevens Pharm., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253 (D.C. Cir. 2005) ("the district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction"); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it

---

[6] All except one of the refusals relevant to this Motion the Government claims to have issued were issued under 8 U.S.C. § 1201(g), which provides:

> No visa or other documentation shall be issued to an alien if (1) it appears to the consular officer, from statements in the application, or in the papers submitted therewith, that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law, (2) the application fails to comply with the provisions of this chapter, or the regulations issued thereunder, or (3) the consular officer knows or has reason to believe that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law . . . .

lacks subject-matter jurisdiction, the court must dismiss the action.").

### 1. Ronaldo

Ronaldo is an Iraqi citizen who applied for COM Approval on October 2, 2009, and completed his visa interview on October 13, 2010. Amended Compl. at ¶ 62. A Declaration submitted by the Government (referred to throughout as the Dybdahl Declaration) states that as of September 1, 2015, Ronaldo's application had been refused under 8 U.S.C. § 1201(g). Dybdahl Decl. ¶ 5. According to the Department of State's Consular Electronic Application Center Case Status Tracker ("Case Status Tracker"), which allows applicants to verify the status of their SIV applications, Pls.' Ex. X [Dkt. No. 43-16], as of September 11, 2015, Ronaldo's application remained in "administrative processing," Pls.' Ex. C. [Dkt. No. 44-4].

Despite the statement from the Government's own declarant that Ronaldo's visa had been refused, the Government's Motion inexplicably asserts four times that Ronaldo has been issued a visa, rendering his claims moot. Gov't's Mot. at 1 n.1 (inaccurately citing Dybdahl Decl. for proposition that Ronaldo had been issued a visa); id. at 10 (same); id. at 8 (repeating claim without citation); id. at 9 (repeating claim without citation). In their Opposition, Plaintiffs correct the

-12-

Government's apparent error as to Ronaldo's application status, noting that Ronaldo has not been issued a visa. Pls.' Opp'n at 3 n.3. The Government's Reply does not acknowledge, correct, or even address the error.

Apparently attempting to set the record straight, on October 15, 2015, Ronaldo's counsel emailed the Immigrant Visa Unit at the U.S. Embassy in Baghdad to inquire about the status of Ronaldo's application. See Ramos-Mrosovsky Decl. [Dkt. No. 48-1]. The Immigrant Visa Unit responded:

> Your client's case remains pending additional administrative processing, which must be completed before a final determination can be made on his Special Immigrant Visa (SIV) application. As soon as this administrative processing stage is finalized, we will immediately contact you with further details. No further action is required from your client at this time.

Supp. Decl. Ex. A [Dkt. No. 48-2]. On October 23, 2015, Plaintiffs submitted a Motion for Leave to File this e-mail and an accompanying declaration on the docket. On November 6, 2015, the Government filed its Opposition, which again, never even acknowledged its previous erroneous statements as to the status of Ronaldo's visa application. Along with its Opposition, the Government filed an updated version of the Dybdahl Declaration ("Second Dybdahl Decl."), which, like the previous Dybdahl Declaration, states that Ronaldo's visa application "remains

refused under [] 8 U.S.C. § 1201(g)." Second Dybdahl Decl. [Dkt. No. 49-1].

Upon this record, it is clear that Ronaldo has not received a visa.

### 2. Alpha

Alpha is an Iraqi citizen who applied for COM Approval on January 5, 2010, and completed his visa interview on August 25, 2011. Amended Compl. ¶ 73. According to the Government's declarant, Alpha and his family members were issued visas on August 30, 2015. Dybdahl Dec. at ¶ 6. Plaintiffs agree that Alpha has been granted a visa. Pls.' Opp'n at 3 n.3. However, the Government's Motion to Dismiss -- filed September 1, 2015 -- states at several points that Alpha's visa application had been finally refused under 8 U.S.C. § 1201(g). Gov't's Mot. at 4, 8, 9, 10, and 13. Plaintiffs' Opposition notes the Government's apparent error, Pls.' Opp'n at 3 n.3, but the Government's Reply fails to acknowledge it.

Accordingly, the Court concludes that Alpha has, in fact, been issued a visa, and Alpha's claims are moot.

### 3. Bravo

Bravo is an Iraqi citizen who applied for COM Approval on March 30, 2011, and completed his visa interview on February 13, 2012. Amended Compl. at ¶ 81. The Dybdahl Declaration states that as of September 1, 2015, Bravo's application had been refused under

-14-

8 U.S.C. § 1201(g), and the Government's Motion states that Bravo's application had received a "final" refusal as of that date. Gov't's Mot. at 10; Dybdahl Decl. ¶ 7. However, on September 4, 2015, Bravo and his family members were issued visas. Pls.' Opp'n at 3 n.3; Second Dybdahl Decl. at ¶ 7. Thus, Bravo's claims are moot.

### 4.   Delta

Delta is an Iraqi citizen who applied for COM Approval on February 1, 2011, and completed his visa interview on October 4, 2011. Amended Compl. at ¶ 89. The Dybdahl Declaration states that Delta and his wife were most recently interviewed by a consular officer on August 27, 2015, but as of September 1, 2015, Delta's application had been refused under 8 U.S.C. § 1201(g). Dybdahl Decl. at ¶ 9. The Second Dybdahl Declaration, however, states that on September 30, 2015, a consular officer issued visas to Delta and his family members. Second Dybdahl Decl. at ¶ 9.[7] Thus, Delta's claims are moot.

### 5.   Foxtrot, India, Juliet, and Alice

Foxtrot, India, Juliet, and Alice are Iraqi citizens. Foxtrot first applied for COM Approval on March 20, 2011, and completed his visa interview on September 17, 2012. Amended Compl. ¶ 100.

---

[7] Plaintiffs' Opposition -- filed September 25, 2015 -- fails to take account of the change in Delta's status.

India first applied for COM Approval on February 2, 2010. Amended Compl. ¶ 125. India and his family members were issued visas in June of 2012. Dybdahl Decl. ¶ 14. However, he and his family were not permitted to board a flight to the United States, and the visas were subsequently revoked. Id.

Juliet first applied for COM Approval on March 29, 2011, and completed his visa interview on March 1, 2012. Amended Compl. ¶ 139.

Alice was granted COM Approval on July 11, 2010, and completed her visa interview on November 24, 2010. Amended Compl. ¶¶ 170-71.

The Dybdahl Declaration states that as of September 1, 2015, Foxtrot, India, Juliet, and Alice's applications had been refused under 8 U.S.C. § 1201(g). Dybdahl Decl. at ¶¶ 11, 14, 15, and 19; see also Second Dybdahl Decl. at ¶¶ 11, 14, 15, and 19 (repeating same as of September 30, 2015). The Government's Motion states that Foxtrot, India, Juliet, and Alice's applications had received "final" refusals as of September 1, 2015. Gov't's Mot. at 10.

According to the Case Status Tracker, as of September 24, 2015, Foxtrot, India, Juliet, and Alice's applications remained in "administrative processing." Pls.' Exs. F, H, I, and K. The Parties disagree as to whether the "administrative processing" designation is consistent with the statement that the applications have been finally refused.

-16-

### 6.   Hotel and Lima

Hotel and Lima are Afghan citizens. Hotel first applied for COM Approval on February 10, 2011, and completed his visa interview on November 19, 2012. Amended Compl. ¶ 110. Lima applied for COM Approval on February 11, 2011, and completed his visa interview on February 26, 2012. Amended Compl. ¶ 34.

The Dybdahl Declaration states that as of September 1, 2015, Hotel and Lima's applications had been refused under 8 U.S.C. § 1201(g). Dybdahl Decl. at ¶¶ 13 and 17; see also Second Dybdahl Decl. at ¶¶ 13 and 17 (repeating same as of September 30, 2015).

The Government's Motion states that Hotel and Lima's applications had received "final" refusals as of September 1, 2015. Gov't's Mot. at 10. According to the State Department's Case Status Tracker, as of September 24, 2015, Hotel and Lima's applications remained in "administrative processing." Pls.' Exs. G and J. Again, the Parties disagree as to whether the "administrative processing" designation is consistent with the statement that the applications have been finally refused.

### 7.   Kilo

Kilo is an Afghan citizen. He submitted his application for COM Approval on August 25, 2014, and no action has been taken on his application since that time. Amended Compl. ¶ 33. Lacking COM Approval, a prerequisite for the second stage of the SIV

application process, Kilo does not have a complete SIV application pending before the State Department. See Dybdahl Decl. ¶ 16; Second Dybdahl Decl. ¶ 16.

### 8.   Mike

Mike is an Afghan citizen. The Dybdahl Declaration states that on December 3, 2012, Mike's SIV application was refused under 8 U.S.C. § 1201(g). Dybdahl Decl. at ¶ 18. The Declaration goes on to state that on April 23, 2013, Mike's application was further refused under 8 U.S.C. § 1182(a)(5)(A),[8] and was returned to USCIS for review and possible revocation of COM Approval. Id. According to the Case Status Tracker, as of September 24, 2015, Mike's application was listed as "At NVC[,]" which refers to the State Department's National Visa Center. Pls.' Ex. D [Dkt. No. 44-3].

## II.   STANDARD OF REVIEW

Under Fed. R. Civ. P. 12(b)(1), "[t]he plaintiff bears the burden of invoking the court's subject matter jurisdiction" to hear his or her claims. Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir. 2015). In deciding whether to grant a motion to dismiss for lack of jurisdiction, the Court must "accept all of the factual allegations in [the] [C]omplaint as true[.]" Jerome Stevens

---

[8] It is far from clear what relationship the cited statute has to Mike's Afghan SIV application, as 8 U.S.C. § 1182(a)(5)(A) specifies the grounds for denying entry to "alien[s] who seek[] to enter the United States for the purpose of performing skilled or unskilled labor[.]"

Pharm., 402 F.3d at 1253-54 (quoting United States v. Gaubert, 499 U.S. 315, 327 (1991)) (internal quotation marks omitted). However, "[w]here necessary to resolve a jurisdictional challenge under Rule 12(b)(1), the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (internal citation and quotation marks omitted).

In order to survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[ ] [his or her] claims across the line from conceivable to plausible." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 563.

Under the Twombly standard, a "court deciding a motion to dismiss must not make any judgment about the probability of the plaintiffs' success . . . [,] must assume all the allegations in the complaint are true (even if doubtful in fact) . . . [, and] must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged." Aktieselskabet AF 21. November

2001 v. Fame Jeans Inc., 525 F.3d 8, 17 (D.C. Cir. 2008) (internal quotation marks and citations omitted). A complaint will not suffice, however, if it "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557) (alteration in Iqbal).

## III. ANALYSIS

### A. Plaintiffs' Motion for Leave to File Supplemental Declaration

Plaintiffs request leave to file an e-mail from the Immigrant Visa Unit of the U.S. Embassy in Baghdad, Iraq stating that Ronaldo's application remains in "administrative processing, which must be completed before a final determination can be made on his [SIV] application." Supp. Decl. Ex. A [Dkt. No. 48-2]. Plaintiffs also ask to file a Declaration explaining the e-mail's origin. Supp. Decl. [Dkt. No. 48].

The Government argues that Plaintiffs' additions to the record are redundant and unnecessary. But Plaintiffs' submission serves to rectify confusion that the Government itself created.

As discussed above, see supra section I.B.1., the Government's Motion erroneously states four times that Ronaldo has been issued a visa. That is clearly incorrect as shown in the

e-mail, which removes the confusion caused by the Government's mistake.

The Court finds it very troubling that the Government would make important factual misstatements, fail to acknowledge them when they are proven to be incorrect, and then oppose the submission of evidence which corrects the mistake.

Second, the Government contends that Plaintiffs' submission is merely an attempt to reiterate arguments from their Opposition. However, Plaintiffs' submission is not argument but evidence, which bears on facts critical to establishing the Court's jurisdiction.

Third, the Government argues that because Plaintiffs' applications have been finally refused, they should not be able to supplement the record with evidence to the contrary. Obviously this argument rests upon the premise that Plaintiffs' applications have been finally adjudicated, but as the Court explains below, the record demonstrates that they have not.

Finally, the Government contends that if the Court accepts Plaintiffs' supplemental filing, "fairness requires that Defendants also be allowed to provide an updated [D]eclaration to ensure that the Court has the proper context in which to analyze the jurisdictional facts as they have developed." Gov't's Opp'n to Pls.' Mot. at 4.

In the interest of efficiency and accuracy in establishing facts relevant to the Court's jurisdiction, the Court will grant Plaintiffs' Motion and consider both the submitted e-mail as well as the updated Declaration that the Government has submitted. See Supp. Decl. Ex. A [Dkt. No. 48-2]; Second Dybdahl Decl. [Dkt. No. 49-1].

**B.   Counts 3-6: Failure to Adjudicate Plaintiffs' Applications**

Counts 3 through 6 of Plaintiffs' Amended Complaint seek an order directing the Government to adjudicate Plaintiffs' SIV applications, which, according to Plaintiffs, are awaiting final action. Counts 3 and 4 arise under the Mandamus Act, 28 U.S.C. § 1361, which grants district courts jurisdiction to hear "action[s] in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Id. Counts 5 and 6 are brought under the APA's grant of authority to "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).

Plaintiffs contend that the APA requires Defendants to finally adjudicate their applications within a "reasonable time[.]" 5 U.S.C. § 555(b) ("With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter

presented to it."). They further contend that the RCIA and AAPA establish nine months as the presumptively reasonable period in which to adjudicate applications. RCIA § 1242(c)(1) ("all steps under the control of the respective departments incidental to the issuance of such visas, including required screenings and background checks, should be completed not later than 9 months after the date on which an eligible alien submits all required materials to complete an application for such visa."); AAPA § 602(4)(A) (same). Because Plaintiffs claim to have waited longer than nine months for final action on their applications, they ask that the Court compel such action under the Mandamus Act and/or the APA.

The Government contends that Plaintiffs lack standing to bring their claims, that the Court otherwise lacks jurisdiction to hear Plaintiffs' claims, and that Plaintiffs have failed to state a claim upon which relief can be granted. Two arguments are central to these grounds for dismissal: 1) that Plaintiffs' applications have already been finally denied and are not subject to judicial review under the doctrine of consular nonreviewability, and 2) that Plaintiffs have failed to identify a non-discretionary duty owed to them or judicially manageable standards to assess the Government's performance of any such duty.

-23-

### 1. **Standing**

The Government contends that Plaintiffs lack standing to litigate Counts 3-6. In order to establish standing, Plaintiffs must demonstrate (1) that they have suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

As alleged in the Amended Complaint, Plaintiffs' primary injury is the deprivation of final decisions on their SIV applications within a reasonable time as required by RCIA § 1242(c)(1), AAPA § 602(b)(4)(A), and the APA, 5 U.S.C. § 555(b). Plaintiffs also allege that the Government's failure to provide timely adjudication of their applications has exposed them and their families to serious, imminent threats to their life and well-being as a result of their service to the United States. Amended Compl. ¶¶ 223, 232, 242, 251.

The Government argues that Plaintiffs lack standing to pursue their claims because their applications have, in fact, been finally refused. According to the Government, because Plaintiffs have

-24-

received final refusals, they have received everything to which they are entitled and have suffered no redressable injury.

The Government is incorrect. Because the Government's contention that Plaintiffs' SIV applications have already been finally adjudicated is intricately intertwined with its other jurisdictional argument based on the doctrine of consular nonreviewability, it can only be unraveled with close scrutiny of the factual record. Accordingly, the Court addresses this issue in detail in section III.B.2.a.

For present purposes, however, the Court notes the following conclusions that are fully explained below: Ronaldo, Foxtrot, India, Juliet, Alice, Hotel, and Lima's SIV applications have not been finally refused and instead, remain in "administrative processing," see infra section III.B.2.a.; Mike and Kilo's SIV applications likewise await additional actions by the Government and thus, have not been finally refused, see infra section III.B.2.c.; Alpha, Bravo, and Delta's applications have been granted, and thus, their claims are moot, see infra section III.B.2.a. Accordingly, Ronaldo, Foxtrot, India, Juliet, Alice, Hotel, Lima, Mike, and Kilo have suffered an injury in fact: the failure to receive final decisions on their SIV applications within a reasonable period.

-25-

Having shown that they have suffered an injury, Plaintiffs must also show that their alleged injury is caused by the complained of conduct. The Government raises no argument with respect to causation. Plaintiffs' alleged injury -- the lack of final decisions on their SIV applications -- is quite clearly caused by Defendants' conduct (i.e., Defendants' failure to adjudicate the applications). Thus, Plaintiffs have satisfied the causation prong of the standing inquiry.

Finally, the Government argues that a favorable decision by this Court would not redress Plaintiffs' injury. The Government first contends that Plaintiffs are not entitled to redress because the timelines set out by Congress for the adjudication of SIV applications are discretionary. This argument, like the Government's contention that Plaintiffs' applications have been finally refused, is also deeply interwoven with other jurisdictional arguments, which will be fully discussed and rejected below in section III.B.3. In summary, the APA, 5 U.S.C. § 555(b), creates a duty for the Government to reach a final decision on Plaintiffs' applications "within a reasonable period," and RCIA § 1242(c)(1) and AAPA § 602(4)(A) clarify that that duty is non-discretionary and must "ordinarily" be completed within nine months. See infra section III.B.3.

-26-

The Government also argues that the Court may not redress Plaintiffs' injuries because courts are not free to fashion their own "coercive sanctions" to bring about compliance with statutory deadlines. See Gov't's Reply at 15 (citing, inter alia, United States v. James Daniel Good, 510 U.S. 43, 63 (1993)). In that case, the Supreme Court overturned a Court of Appeals' holding that failure to comply with certain timing requirements applicable to asset forfeiture mandated dismissal of the forfeiture action. 510 U.S. at 63. The Supreme Court characterized the lower court's dismissal of the Government's action as the creation of a "coercive sanction" on the Government's failure to meet certain statutory timing directives. Id.

That is not the situation in this case. Plaintiffs do not seek to construct any sanction for the Government's failure to process their SIV applications, nor do they seek review of any substantive decisions by the Government. Instead, Plaintiffs ask the Court to do just what the APA and the Mandamus Act authorize: issue an order to adjudicate their applications, whatever the substantive results may be. See 5 U.S.C. § 706(1); 28 U.S.C. § 1361. Such an order would directly redress Plaintiffs' injury caused by the Government's failure to decide.

In short, Plaintiffs have been injured by the failure to obtain final decisions on their SIV applications, that injury is

-27-

caused by the Government's failure to act, and the injury would be redressed by an order from this Court. Accordingly, Plaintiffs have made the injury, causation, and redressability showings required to establish standing to pursue their claims. Lujan, 504 U.S. at 560-61.

### 2.    The Doctrine of Consular Nonreviewability

As already discussed, the Government's major argument is that Plaintiffs' applications have already been finally refused and the doctrine of consular nonreviewability precludes any further review of those decisions. This fact, the Government contends, deprives Plaintiffs of standing to bring their claims, and deprives the Court of jurisdiction to hear them.

The Government summarizes the core of its argument in its opening brief:

> Because each and every Plaintiff received final action under 8 U.S.C. § 1201(g), a valid statutory basis of ineligibility (see generally Ex. 1, Dybdahl Declaration (listing dates of refusals)), the doctrine of consular nonreviewability bars Plaintiffs' requests for review of final decisions of a consular officer. See Saavedra Bruno [v. Albright, 197 F.3d 1153, 1156 (D.C. Cir. 1999)]. Thus, Plaintiffs' requests for adjudication of their applications, and communication of the results, can only be viewed as confused or disingenuous. See Compl. at Prayer for Relief ¶ 3. Indeed, what the Plaintiffs truly appear to seek is judicial re-adjudication -- or review -- of these final decisions. The doctrine prohibits this.

Gov't's Mot. at 24.

-28-

### a.   *Status of Plaintiffs' Applications*

The Government asserts, repeatedly and emphatically, that "[i]n this case, each and every Plaintiff who made a visa application appeared for a live interview to execute their visa applications and received a final refusal under 8 U.S.C. § 1201(g) and/or other grounds." Gov't's Mot. at 13; id. at 14 ("Each refusal constituted a final decision as a matter of law."); id. ("like Plaintiff Alpha, the other Plaintiffs have indeed received final agency action -- denials of their visa applications under 8 U.S.C. § 1201(g)"); see also Gov't's Mot. at 23, 24. Accordingly, the Government contends that "what the Plaintiffs truly appear to seek is judicial re-adjudication--or review--of these final decisions." Gov't's Mot. at 24 (emphasis in original).

However, the facts do not support the Government's repeated and emphatic assertions.

As discussed in section I.B. above, Plaintiffs Alpha, Bravo, and Delta have clearly received final decisions granting their SIV applications. Thus, their claims are moot, and they have no standing to litigate the case.

Ronaldo, Foxtrot, India, Juliet, Alice, Hotel, and Lima's situations are not quite as simple. The Government contends that these seven Plaintiffs have each received final refusals under 8 U.S.C. § 1201(g), which provides in relevant part that consular

-29-

officers shall not issue visas if an applicant is ineligible to receive a visa or the application fails to comply with applicable statutory and regulatory provisions. E.g., Gov't's Reply at 14 ("all Plaintiffs who have made SIV applications have already received final decisions" (emphasis in original)); Dybdahl Decl. at ¶¶ 5, 11, 13, 14, 15, 17, 19.

Plaintiffs, on the other hand, contend that their applications have not been refused, and instead, languish in an intermediate and amorphous stage of "administrative processing." See Pls.' Exs. E-K (screen shots of State Department's Case Status Tracker showing these seven Plaintiffs' application status as "administrative processing," as of September 24, 2015).

In support of their contention that their applications have not received a final decision, Plaintiffs put forth a significant body of evidence.[9] First and foremost, the Government's own Case Status Tracker states that Plaintiffs' applications remained in "administrative processing" as of September 24, 2015. Pls.' Exs. E-K.

---

[9] Again, while Courts do not ordinarily make factual findings at the motion-to-dismiss stage, Aktieselskabet, 525 F.3d at 17, the Court must do so here because the status of Plaintiffs' applications determines the Court's jurisdiction to entertain their claims. See Saavedra Bruno, 197 F.3d at 1162; Jerome Stevens Pharm., 402 F.3d at 1253-54 (holding that courts may look beyond pleadings in the complaint to ascertain their own jurisdiction).

The Government responds that "administrative processing" is not distinct from final refusal. Gov't's Mot. at 13-15. In the Government's view, when an SIV applicant leaves a consular interview without a visa in hand, his or her application has been denied. Id. at 13. In support of its position, the Government points to regulations and State Department guidance documents indicating that consular officers must grant or deny a visa application immediately once the application is complete. 22 C.F.R § 42.81(a). ("When a visa application has been properly completed and executed before a consular officer . . . the consular officer must either issue or refuse the visa . . .  "). The State Department's Foreign Affairs Manual ("FAM") adds, "There is no such thing as an informal refusal or a pending case once a formal application has been made." 9 FAM 42.81 N1.

Thus, according to the Government, because all visas are either issued or denied immediately, any further processing of a visa application is best viewed as a "reconsideration" of the application's denial, rather than an additional step in the 14-step process. See Gov't's Mot. at 15; Gov't's Reply at 7 ("It is to the benefit of the visa applicant that, even after a final [§ 1201(g)] refusal, a consular officer may continue to consider a case (i.e., to engage in further administrative processing) to potentially further adjudicate the visa application. But a consular officer's

discretionary decision to allow for further administrative processing after a [§ 1201(g)] refusal does not create any new legal duty, and does not give an applicant any basis to sue to expedite that post-refusal processing.").

However, additional evidence presented by Plaintiffs demonstrates that the Government's characterization of the visa decision process conflicts with its own actual practices and statements.

The dozen Joint Department of State / Department of Homeland Security Reports to Congress ("Joint Reports") that Plaintiffs have filed make clear that "administrative processing" is not a discretionary opportunity for reconsideration. Pls.' Exs. L-W. Rather, each and every one of the Joint Reports submitted makes clear that "administrative processing" is a mandatory step in the SIV application process. "Administrative processing" is not an opportunity for reconsideration of a decision but is a pre-requisite to reaching the decision itself--a crucial distinction.

Indeed, the Joint Reports describe "administrative processing" as step 13 of the 14 required steps in the SIV process. E.g., Pls.' Ex. L at 3-4 [Dkt. No. 43-4]. The Joint Reports state that at step 12, which is the interview stage, the "[a]pplicant is interviewed by [a] consular officer on the scheduled appointment date[,]" and "[a]dministrative processing is initiated following

-32-

the interview." E.g., id. At step 13 "[t]he applicant's case undergoes administrative processing[.]" Id. At step 14, "[u]pon completion of administrative processing, [the] applicant is instructed to obtain a medical exam. The visa is issued if [the] applicant is eligible." E.g., id. Nowhere do the Joint Reports indicate that a final decision is made before "administrative processing" begins.

The Joint Reports go on to note that "[e]ven if an applicant has acted promptly in each of the applicant-controlled steps that precede step 13 of the SIV application process [i.e., administrative processing], applications may be pending longer than nine months for completion of administrative processing." E.g., id. at 4-5.[10] The section concludes, "Although step 13 is lengthy, process enhancements have resulted in improved efficiency." E.g., id. at 5. The other Joint Reports contain substantially the same statements. See Pls.' Exs. L-W.[11]

---

[10] According to the Joint Report for SIVs issued between April 1, 2014 and March 31, 2015, administrative processing took an average of 153 business days. Pls.' Ex. L at 4.

[11] The Joint Reports' invocation of the nine month timeline is itself an indication that the Government understands "administrative processing" to constitute a pre-cursor to a final decision. RCIA § 1242(c)(2) and AAPA § 602(b)(4)(A) state that "all steps under the control of the respective departments incidental to the issuance of such visas, . . . should be completed not later than 9 months after the date on which an eligible alien submits all required materials to complete an application for such visa."

-33-

Defendants' formal representations to Congress in their Joint Reports are simply incompatible with the notion that SIV applicants in general, and Plaintiffs in particular, have already received final decisions on their applications by the time they reach the "administrative processing" stage.

Documents that the Government gives to SIV applicants following their consular interviews also belie the Government's contention that such "denials" are final or even any kind of decision at all. For example, following their consular interviews, Plaintiffs who applied through the Baghdad Embassy received a notice stating "[w]e have refused your visa under section 221(g) of the Immigration and National Act [8 U.S.C. § 1201(g)] until: We complete administrative processing. We will contact you when it is finished." Iraqi Refusal Notice, Pls.' Ex. BB (emphasis added). This artfully worded letter appears calculated to obtain the benefits of consular reviewability and to comply with internal

---

If administrative processing constituted reconsideration of SIV applications, as the Government claims, then time spent on such reconsideration would not count toward the nine-month target for completing "all steps . . . incidental to the issuance of [SIVs.]" Id. However, the Government does count delays due to "administrative processing" toward the nine-month timeline, see Pls.' Exs. L-W, which further indicates that "administrative processing" is part of the visa review process and not mere reconsideration of applications, which have already been denied.

-34-

State Department regulations[12] by indicating that a decision has been made. But the text that follows the word "until" makes clear that no final decision on the application will occur until "administrative processing" is complete.[13]

The notice provided to applicants at the Kabul Embassy similarly advises applicants that their application "needs further administrative processing." See Afghan Refusal Notice, Pls. Ex. CC. It states, "We cannot give you a definitive date when the processing will be completed, and it will likely take several months or more." Id. Again presumably attempting to trigger the doctrine of consular nonreviewability, the Afghan Refusal Notice also states that the Notice "constitutes a denial of a visa" under 8 U.S.C. § 1201(g). Id.

However, if "administrative processing" is a necessary step in the SIV application process, the failure to receive a visa before "administrative processing" is completed is not a denial at all. In fact, if an applicant were somehow to receive a visa in

---

[12] See 22 C.F.R § 42.81(a); 9 FAM 42.81 N1.

[13] Another district court has held that a similarly equivocal statement did not constitute a denial. Assad v. Holder, Civ. No. 2:13-00117, 2013 WL 5935631, at *1 & *4 (D.N.J. Nov. 1, 2013) ("[L]etter [received by visa applicant that] stated that the case required 'Administrative Review' and that 'new information, when available, will be communicated to you in writing'" was held to "clearly indicate that the decision on [plaintiff's] visa [was] still pending and not final.").

comply with internal State Department regulations[12] by indicating that a decision has been made. But the text that follows the word "until" makes clear that no final decision on the application will occur until "administrative processing" is complete.[13]

The notice provided to applicants at the Kabul Embassy similarly advises applicants that their application "needs further administrative processing." See Afghan Refusal Notice, Pls. Ex. CC. It states, "We cannot give you a definitive date when the processing will be completed, and it will likely take several months or more." Id. Again presumably attempting to trigger the doctrine of consular nonreviewability, the Afghan Refusal Notice also states that the Notice "constitutes a denial of a visa" under 8 U.S.C. § 1201(g). Id.

However, if "administrative processing" is a necessary step in the SIV application process, the failure to receive a visa before "administrative processing" is completed is not a denial at all. In fact, if an applicant were somehow to receive a visa in

---

[12] See 22 C.F.R § 42.81(a); 9 FAM 42.81 N1.

[13] Another district court has held that a similarly equivocal statement did not constitute a denial. Assad v. Holder, Civ. No. 2:13-00117, 2013 WL 5935631, at *1 & *4 (D.N.J. Nov. 1, 2013) ("[L]etter [received by visa applicant that] stated that the case required 'Administrative Review' and that 'new information, when available, will be communicated to you in writing'" was held to "clearly indicate that the decision on [plaintiff's] visa [was] still pending and not final.").

advance of administrative processing, that step would be premature. The Government has never argued that "administrative processing" could be completed immediately after the interview. Indeed the Joint Reports show that "administrative processing" usually requires many months to finish. See e.g., Pls.' Ex. S (as of July 15, 2014, the average Afghan SIV application spent 145 business days in "administrative processing").

The U.S. Embassy in Baghdad's website also demonstrates that "administrative processing" does not mean "refused." A page on that website informs SIV applicants of the meaning of what they will see upon logging into the State Department's Consular Electronic Application Center:

> You will see one of the following status indicators appear:
>
> **Administrative Processing** - Your case is currently undergoing additional administrative processing. This processing can take several months to be completed. You do not need to contact us. We will contact you with further instructions once this processing stage is finalized.
>
> **Issued** - Your visa has been issued and we are preparing the return of your passport to you using the prepaid courier airway bill you provided to us during your interview. You will receive an email from us with your shipment tracking number as soon as your visa has been posted in the mail.
>
> **Refused** - Your visa application has been refused. Please see the letter you received during your interview, or by mail, for further details.

Pls.' Ex. X at 2 (available at http://iraq.usembassy.gov/administrative-processing.html).[14]

Although Bravo's claims are now moot, the facts of his application are part of the record before the Court, and they shed additional light on the SIV approval process. The Dybdahl Declaration asserts that Bravo and his family appeared for a consular interview on August 31, 2015, but that as of September 1, 2015, his "case remains refused under INA § 221(g), 8 U.S.C. § 1201(g)." Dybdahl Decl. at ¶ 7.[15]

The Second Dybdahl Declaration states that just three days later, on September 4, 2015, a consular officer issued visas to

_____

[14] See also Pls.' Opp'n at 16 (citing other portions of the Baghdad Embassy's website stating, among other things, "We initially refuse most immigrant visa applications under [8 U.S.C. § 1201(g)]. There is usually no need to worry: it is almost always a **temporary** refusal." (emphasis in original) (quoting Pls.' Ex. AA (available at http://iraq.usembassy.gov/221g/what-does-a-221g-refusal-mean.html)).

This statement from the Embassy website is not consistent with the Foreign Affairs Manual's statement that "[t]here is no such thing as an informal refusal or a pending case once a formal application has been made." 9 FAM 42.81 N1. An application that received only "temporary refusal" would seem to remain pending.

[15] It bears repeating that the Dybdahl Declaration also states that the applications of seven other Plaintiffs had been "refused" despite the Case Status Tracker's indication that they remained in "administrative processing." Dybdahl Decl. ¶¶ 5, 11, 13, 14, 15, 17, 19; Pls. Exs. E-K. The record does not include a Case Status Tracker entry for Bravo during this three-day period, but from Plaintiffs' allegations and the facts in the record, it would seem that between August 31 and September 4, 2015, Bravo's application was in "administrative processing."

-37-

Bravo and his family members. Second Dybdahl Decl. ¶ 7. There is no evidence in the record indicating that Bravo supplemented his application in any way between August 31, 2015 and September 4, 2015.

In the Government's view, when Bravo left the Baghdad Consulate on August 31, 2015, his visa had been finally refused under 8 U.S.C. § 1201(g). In light of the Government's Joint Reports, this characterization strains credulity. Gov't's Mot. at 9. Plainly, Bravo's application--like those currently undergoing "administrative processing"--remained under consideration on August 31, 2015, and the Government only reached a final decision on September 4, 2015.

Finally, if there was any doubt that "administrative processing" precedes--and does not equate to--a final determination, Plaintiffs' supplemental filing settles the question. In response to an e-mail written "to follow up with [the U.S. Embassy in Baghdad] on the status of [Ronaldo's] application[,]" the Immigrant Visa Unit of the Embassy replied:

> Your client's case remains pending additional administrative processing, which must be completed before a final determination can be made on his Special Immigrant Visa (SIV) application. As soon as this administrative processing stage is finalized, we will immediately contact you with further details. No further action is required from your client at this time.

-38-

Pls.' Supp. Decl. Ex. A (emphasis added). This e-mail shows, as does the abundance of other evidence Plaintiffs provide, that any Plaintiff with an application in "administrative processing" has not yet received a final decision.[16]

The Government argues that because 8 U.S.C. § 1201(g) places the burden of demonstrating visa eligibility on the applicants, a consular officer's failure to grant a visa following an interview means that Plaintiffs have not met their burden. The Government's argument, however, does not mesh with the SIV adjudication process it has described to Congress. Pursuant to the 14-step process described above, no SIV applicant could possibly receive a visa

---

[16] In a curious passage of its opening brief, the Government asserts that "[i]n an effort to manufacture jurisdiction, Plaintiffs equivocate, selectively substituting the term 'administrative processing' for adjudication where it suits them." Gov't's Mot. at 13. But Plaintiffs have not created the term "administrative processing." The Government has told Plaintiffs in e-mails, letters, and the State Department's own Case Status Tracker that their applications remain in "administrative processing." Plaintiffs take "administrative processing" to mean what the Government says it means in its reports to Congress and on its Embassy website: one of 14 steps that must be completed before an SIV may be issued.

Indeed, it is the Government that equivocates: Sometimes "administrative processing" means "administrative processing"; other times it means finally adjudicated. The Government admits as much elsewhere in its briefing. See Gov't's Reply at 10 ("It is understandable as a practical matter that the State Department's references to 'administrative processing' in various contexts may create confusion. But the use of the term 'administrative processing' following a visa refusal does not, in any way, nullify the refusal or render it non-final as a matter of law.").

before "administrative processing," and "administrative processing" necessarily follows the consular interview. Thus, the fact that an SIV applicant does not receive a visa after his or her interview says nothing about whether he or she has met his or her burden.

Despite the convincing evidence Plaintiffs cite to show that Defendants have not finally adjudicated their SIV applications, which still remain in "administrative processing," the Government contends that the Court should treat those applications as finally denied as a matter of law. Gov't's Mot. at 25 ("Plaintiffs' disagreement with the discretionary decisions of consular officers does not change the fact that their applications were refused. As a matter of law, the inquiry ends there."). The Court disagrees.

The Government contends that because regulations and State Department guidance documents governing the visa process require consular officers to "either issue or refuse the visa" when presented with a complete application, the Court should treat Plaintiffs pending applications as refused. Gov't's Mot. at 11 (quoting 22 C.F.R. § 42.81); see also 9 FAM 42.81 N1. However, it is clear that visa applications are not always being finally refused in any meaningful sense immediately upon presentation of

a completed application.[17] The Foreign Affairs Manual's statement that "[t]here is no such thing as an informal refusal or a pending case once a formal application has been made[,]" 9 FAM 42.81 N1, simply does not accord with Defendants' practices, as the record demonstrates.

The Government also cites 8 U.S.C. § 1201(g) itself for the proposition that Plaintiffs have all received final refusals as a matter of law. Gov't's Mot. at 14 ("Each refusal constituted a final decision as a matter of law. See 8 U.S.C. § 1201(g)."). But § 1201(g) merely contains the (expansive) criteria for refusing an application; it does not establish when or whether, as a matter of law, an application has been refused.

The Government next turns to case law, arguing that "Plaintiffs fail to meet their burden to demonstrate standing because there is a long line of cases explaining that non-resident aliens lack standing to challenge the determinations associated with their visa applications, which belong to the political and not judicial branches of government." Gov't's Mot. at 16 (quoting Van Ravenswaay v. Napolitano, 613 F. Supp. 2d 1, 5 (D.D.C. 2009)).

---

[17] Indeed, at least one other District Court has reached the same conclusion. See Schutz v. Secretary, Department of State, No. 6:11-cv-1296-Orl-31, 2012 WL 275521, at *2-4 (M.D. Fla. Jan. 31, 2012) (holding that 22 C.F.R. § 42.81 did not render application "refused" when applicant was not issued visa and only explanation was reference to broad statute stating many grounds for denial).

The Government's argument--and the case it cites--rest upon the premise that that Plaintiffs seek to challenge elements of a final decision with which they disagree. Van Ravenswaay, 613 F. Supp. 2d at 4 (holding that doctrine of consular nonreviewability precluded action "seeking judicial review regarding the action of the consul" when the consul had denied plaintiff's visa application). But for the reasons already stated, Plaintiffs applications remain pending and have not been finally denied. Thus, Van Ravenswaay offers no aid to the Government's case. Moreover, Plaintiffs are not challenging the substance of any decisions made by the Government.

The Government also makes much of a passage in Justice Kennedy's concurrence in Kerry v. Din, 135 S.Ct. 2128, 2141 (2015), in which he states that the Government satisfies any due process duty owed to visa applicants and their citizen relatives when it cites the statutory basis for a visa application's denial. But again, the Government's reliance is misplaced. Plaintiffs do not contend that they were entitled to a more fulsome explanation of the Government's decision on each of their SIV applications -- they merely claim that they are entitled to a decision.[18]

---

[18] The Government also looks to Svensborn v. Keisler, No. C07-5003 TEH, 2007 WL 3342751, at *4 (N.D. Cal. Nov. 7, 2007) and Toor v. Clinton, No. 1:09CVF279OWWGSA, 2009 WL 1582900, at *4-*5 (E.D. Cal. June 4, 2009) for support. In both, the court considered whether the plaintiffs could bring an action to compel

The Government next claims that its denial of the SIV applications of two Plaintiffs named in the initial Complaint, but not in the Amended Complaint, somehow indicates that the remaining Plaintiffs' applications have been denied:

> Plaintiffs do not deny, and cannot deny, that since the outset of this action, two of the nine original Plaintiffs have been refused visas on terrorism-related grounds. See Dybdahl Decl. at 3, 4-5 (discussing visa refusals of Plaintiffs Charlie and Golf under 8 U.S.C. § 1182(a)(3)(B)). Yet Plaintiffs' original Complaint, ECF No. 1, made the same arguments for Plaintiffs Charlie and Golf that Plaintiffs continue to make for all others in this case. But there is no question, and Plaintiffs make no argument, that Defendants can somehow ignore their statutory duty under 8 U.S.C. § 1182(a) -- including subsection (a)(3)(B) -- which prohibits the issuance of visas to, inter alia, persons who engage in terrorist activities.

Gov't's Reply at 5.

This argument makes little sense (and even tends to support Plaintiffs' contentions). By omitting Golf and Charlie from their Amended Complaint, Plaintiffs appear to agree that they received final decisions on their applications after they filed their initial Complaint and, as already noted, are not seeking review of the substance of the decision. See Compl. (filed February 26, 2015); Dybdahl Decl. ¶¶ 8, 12 (Charlie's application denied under

---

reconsideration of their visa applications. In the case at hand, however, Plaintiffs do not ask for reconsideration because they have not yet received final decisions on their SIV applications. Accordingly, Svensborn and Toor are inapplicable.

§ 1182(a)(3)(B) on May 7, 2015 and Golf's application denied under § 1182(a)(3)(B) on June 28, 2015).

None of the remaining Plaintiffs, however, have received final, terrorism-related refusals under 8 U.S.C. § 1182(a)(3)(B). Instead, as discussed at length above, they await final decisions following "administrative processing." The Government's invocation of Golf and Charlie serves only to highlight the contrast between their final, terrorism-related refusals and the other Plaintiffs' indefinite wait for the end of the SIV process.

By consigning applicants to "administrative processing," the Government endeavored to enjoy the benefits of consular nonreviewability, which is explained immediately below, without having to report to Congress that it has denied the SIV applications of many Iraqis and Afghans who supported the United States' military efforts in their countries. The applications have either been finally denied or they are still working their way through the 14 steps the Government requires to be completed. The Government cannot have it both ways. For the reasons already stated, the Court concludes that the SIV applications of Ronaldo, Foxtrot, India, Juliet, Alice, Hotel, and Lima remain in "administrative processing," and have not been finally refused.

-44-

### b.   Consular Nonreviewability

In its seminal case on consular nonreviewability, our Court

of Appeals explained the doctrine as follows:

> In view of the political nature of visa determinations
> and of the lack of any statute expressly authorizing
> judicial review of consular officers' actions, courts
> have applied what has become known as the doctrine of
> consular nonreviewability. The doctrine holds that a
> consular official's decision to issue or withhold a visa
> is not subject to judicial review, at least unless
> Congress says otherwise.

Saavedra Bruno, 197 F.3d at 1159. In an earlier, terser statement

of the doctrine, the Court noted that "a consular officer could

make such a decision [to deny a visa] without fear of reversal

since visa decisions are nonreviewable." Castaneda-Gonzalez v.

Immigration & Naturalization Serv., 564 F.2d 417, 428 n.25 (D.C.

Cir. 1977).

The doctrine preceded passage of the APA and constitutes an

exception to the presumption of judicial review as contemplated in

the APA. Saavedra Bruno, 197 F.3d at 1160-62. It sweeps broadly,

"appl[ying] even where it is alleged that the consular officer

failed to follow regulations, where the applicant challenges the

validity of the regulations on which the decision was based, or

where the decision is alleged to have been based on a factual or

legal error." Van Ravenswaay, 613 F. Supp. 2d at 4 (quoting Chun

v. Powell, 223 F. Supp. 2d 204, 206 (D.D.C. 2002)); see also

Gov't's Mot. at 25-26 (collecting cases showing the breadth of unlawful actions by consular officers that are nevertheless unreviewable by the district courts).

"[T]he doctrine also applies where a plaintiff attempts to circumvent the doctrine by claiming that he is not seeking a review of the consular officer's decision, but is challenging some other, related aspect of the decision." Malyutin v. Rice, 677 F. Supp. 2d 43, 46 (D.D.C. 2009), summarily aff'd No. 10-5015, 2010 WL 2710451 (D.C. Cir. July 6, 2010), cert. denied 131 S. Ct. 949 (2011).

However, as Plaintiffs point out, the doctrine of consular nonreviewability is not triggered until a consular officer has made a decision with respect to a particular visa application. Patel v. Reno, 134 F.3d 929, 932 (9th Cir. 1997); see also Maramjaya v. U.S. Citizenship & Immigration Servs., No. CIV.A. 06-2158 RCL, 2008 WL 9398947, at *4 (D.D.C. Mar. 26, 2008) (doctrine of consular nonreviewability did not apply when "case ha[d] not procedurally progressed to the point where consular immunity would bar judicial review" because plaintiff did not "challenge the visa decision of any consular official" and instead challenged agency actions antecedent to such a decision).[19]

---

[19] In per curium affirmances that rely on Saavedra Bruno's statement of the doctrine of consular nonreviewability, our Court of Appeals has consistently relied on the consulate having reached a concrete decision on the application at issue. See e.g., Malyutin v. Rice, No. 10-5015, 2010 WL 2710451, at *1 (D.C. Cir. July 6, 2010)

The doctrine applies only once a consular officer has made a decision because it protects the prerogative of the political branches to regulate the manner in which aliens may enter the United States. Saavedra Bruno, 197 F.3d at 1159 ("it is . . . not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." (internal quotation marks and citation omitted)). When the Government simply declines to provide a decision in the manner provided by Congress, it is not exercising its prerogative to grant or deny applications but failing to act at all. Id. at 1161 ("For [] aliens [seeking admission to the United States] the procedure fixed by Congress is deemed to be due process of law." (quoting 1961 U.S.C.C.A.N. 2950, 2976)).

---

("Although appellant asserts he is challenging a denial of his request for access to the state court rather than the denial of his application for a visa, determining whether appellant is entitled to damages from appellees would ultimately require reviewing the decision to deny appellant a visa. That decision is clearly unreviewable, however." (emphasis added)); Semiani v. United States, 575 F.3d 715, 715 (D.C. Cir. 2009) ("The district court properly dismissed appellant's complaint for lack of subject matter jurisdiction because 'a consular official's decision to issue or withhold a visa is not subject to judicial review,' unless Congress indicates otherwise." (emphasis added)); see also Noble v. Ricciardonne, 161 F. App'x 22, 22-23 (D.C. Cir. 2005); Antonenko v. Dep't of State, No. 03-5327, 2004 WL 1080159, at *1 (D.C. Cir. May 13, 2004).

Confirming that the doctrine is inapplicable in the absence of a consular decision, the Court of Appeals for the Ninth Circuit has held that visa applicants may challenge the Government's suspension (rather than adjudication) of their visa applications. Patel, 134 F.3d at 932. Noting that the Patel plaintiffs "[we]re challenging the consul's authority to suspend their visa applications, not challenging a decision within the discretion of the consul[, the Court held that] jurisdiction exists to consider whether the consulate has the authority to suspend the visa applications." Id. (emphasis added). "Normally a consular official's discretionary decision to grant or deny a visa petition is not subject to judicial review. However, when the suit challenges the authority of the consul to take or fail to take an action as opposed to a decision taken within the consul's discretion, jurisdiction exists." Id. at 931-32.[20]

---

[20] The Government contends that Patel, 134 F.3d 929 is inapplicable because that case involved consideration of a now-outdated regulation. Compare 22 C.F.R. § 42.81(a) (1997) ("When a visa application has been properly completed and executed before a consular officer in accordance with the provisions of INA and the implementing regulations, the consular officer shall either issue or refuse the visa."), with 22 C.F.R. § 42.81 (2015) ("When a visa application has been properly completed and executed before a consular officer in accordance with the provisions of INA and the implementing regulations, the consular officer must either issue or refuse the visa under INA 212(a) or INA 221(g) or other applicable law."). The Government's argument is simply not convincing.

District courts outside of the Ninth Circuit have reached the same conclusion. <u>See</u> <u>Am. Acad. of Religion v. Chertoff</u>, 463 F. Supp. 2d 400, 421 (S.D.N.Y. 2006) ("[T]he wide latitude given the Executive to grant or deny a visa application . . . does not include the authority to refuse to adjudicate a visa application."); <u>Ceken v. Chertoff</u>, 536 F. Supp. 2d 211, 216 (D. Conn. 2008) (following <u>Am. Acad. of Religion</u>, 463 F. Supp. 2d at 420-21); <u>see also Raduga USA Corp. v. U.S. Dep't of State</u>, 440 F. Supp. 2d 1140, 1146 (S.D. Cal. 2005) (following <u>Patel</u>, 134 F.3d at 932 and holding the doctrine of consular nonreviewability inapplicable where "the consular official has not made any decision in four years to date. That is the crux of this case.").[21]

---

However, <u>Patel</u>, as the Court reads it, stands for the proposition that the doctrine of consular nonreviewability does not apply unless a consular official has actually granted or refused an application. While revised § 42.81's references to certain statutory bases for denial may clarify what the Government considers a refusal, they do not undermine the <u>Patel</u> court's conclusion that a <u>decision</u> to grant or refuse a visa application is a pre-requisite to application of the doctrine.

[21] The Government cites several cases from district courts in other circuits that indicate that the doctrine of consular nonreviewability would apply even in the absence of a final decision. <u>E.g.</u>, <u>Saleh v. Holder</u>, 84 F. Supp. 3d 135, 139 (E.D.N.Y. 2014 (rejecting plaintiffs' argument "that the doctrine does not apply to a request that a visa be adjudicated (as opposed to granted) within a reasonable period of time" because "courts lack subject matter jurisdiction to review the visa-issuing process"). These cases are unpersuasive given our Court of Appeals' characterization of the doctrine as applicable to "a consular official's <u>decision</u> to issue or withhold a visa" rather than the

In short, the doctrine holds only that "there may be no judicial review of [] decisions to exclude aliens unless Congress has expressly authorized this[,]" Saavedra Bruno, 197 F.3d at 1162 (emphasis added and internal quotation marks omitted), but does not preclude Plaintiffs from challenging the Government's failure to decide, Patel, 134 F.3d at 932. Accordingly, because the applications of Ronaldo, Foxtrot, India, Juliet, Alice, Hotel, and Lima remain in "administrative processing" and, therefore, have not been finally refused, the doctrine of consular nonreviewability does not bar their claims. See e.g., Maramjaya, 2008 WL 9398947, at *4; Patel, 134 F.3d at 931-32.

### c. *Status of Kilo and Mike's applications*

Plaintiff Kilo's application has not advanced as far as those of other Plaintiffs and is not at the "administrative processing" (13th) step. The parties agree that he has not yet received COM Approval, although he applied for it on August 25, 2014. Amended Compl. ¶ 33. The Government contends that Kilo lacks standing to bring his claims because, not having submitted an SIV application, he cannot claim that he is injured by the Government's failure to adjudicate an SIV application. The Government oversimplifies Kilo's situation.

---

failure to make a decision at all. Saavedra Bruno, 197 F.3d at 1159 (emphasis added).

Kilo has not submitted his full SIV application because he
must first obtain COM Approval confirming his "employment and
faithful and valuable service to the United States Government[.]"
APAA § 602(b)(2)(D)(i). Thus, like the other Plaintiffs, without
action by the Government, there is nothing Kilo can do to advance
his application.

Review of applications for COM Approval is non-discretionary.
APAA § 602(b)(2)(D)(i) states that the appropriate Chief of
Mission, or her designee, "shall conduct a risk assessment of the
alien and an independent review of records maintained by the United
States Government or hiring organization or entity to confirm
employment and faithful and valuable service . . . ." Id. (emphasis
added). Moreover, applicants denied COM Approval have appeal
rights specified in AAPA § 602(b)(2)(D)(ii).

Finally, the Government does not raise its consular
nonreviewability argument with respect to Kilo's application.

Accordingly, the Court concludes that Kilo, like the
Plaintiffs mired in "administrative processing," has established
the Court's jurisdiction to hear his claims for an order compelling
the Government to act on his application within a reasonable time.

As to Mike's application, the State Department's Case Status
Tracker lists his application as "at NVC" (that is, at the
Department's National Visa Center). Pls.' Ex. D [Dkt. No. 44-3].

-51-

SIV applications are sent to the NVC at the second stage of the SIV approval process, just before the interview stage begins. E.g., Pls.' Ex. R at 3. Thus, Mike's application appears to simply be pending at an earlier stage in the process than those of the Plaintiffs stuck in "administrative processing."

The Government offers no reasons to treat Mike's application differently from the others, and the Court finds no reason to do so.

To summarize, Alpha, Bravo, and Delta have received final decisions on their SIV applications, and thus, their claims are now moot. Ronaldo, Foxtrot, India, Juliet, Alice, Hotel, Lima, Kilo, and Mike's SIV applications remain pending. These Plaintiffs have suffered an injury in fact, as they must in order to have standing to pursue this litigation, and their claims are not subject to the doctrine of consular nonreviewability.

### 3.   Judicially Manageable Standards to Enforce a Non-discretionary Duty

The Government next contends that Counts 3-6 must be dismissed for lack of jurisdiction because Plaintiffs fail to identify a non-discretionary duty owed them as well as judicially manageable standards by which the Court may measure compliance with that duty.

The APA provides that "within a reasonable time, each agency shall proceed to conclude a matter presented to it." 5 U.S.C. § 555(b). Thus, "[t]he APA imposes a general but nondiscretionary

duty upon an administrative agency to pass upon a matter presented
to it 'within a reasonable time,' 5 U.S.C. § 555(b), and authorizes
a reviewing court to 'compel agency action unlawfully withheld or
unreasonably delayed,' id. § 706(1)." Fort Sill Apache Tribe v.
Nat'l Indian Gaming Comm'n, No. CV 14-958, 2015 WL 2203497, at *4
(D.D.C. May 12, 2015) (citing Mashpee Wampanoag Tribal Council,
Inc. v. Norton, 336 F.3d 1094, 1099-1100 (D.C. Cir. 2003)).

The RCIA and AAPA provide additional guidance, instructing
that Defendants shall process SIV applications within nine months.
RCIA § 1242(c)(1); AAPA §§ 602(4)(A). The text of the statutes
makes clear that the nine-month timeline applies to "all steps"
under Defendants' control "incidental to the issuance of such [SIV]
visas[.]" Id. Thus, the timeline applies to each of the 14 steps
in the SIV adjudication process identified in the Joint Reports
that are within Defendants' control, including "administrative
processing" and "COM Approval." E.g., Pls.' Ex. O at 3.

Simply put, the APA imposes a duty[22] on Defendants to act
within a "reasonable" time on Plaintiffs' applications, and the

---

[22] The regulations on which the Government relies to bolster its
argument that Plaintiffs' applications have been denied support
the conclusion that the Government's duty to decide Plaintiffs'
applications is non-discretionary. See Gov't's Mot. at 11 ("Upon
receipt of a proper visa application, a consular officer
adjudicating the application 'must either issue or refuse the
visa.'" (quoting 22 C.F.R. § 42.81)).

RCIA and AAPA provide manageable standards (an explicit timeline)

by which a Court may assess the Government's compliance. Moreover,

our Court of Appeals has stated that:

> [T]he time agencies take to make decisions must be
> governed by a rule of reason [and] where Congress has
> provided a timetable or other indication of the speed
> with which it expects the agency to proceed in the
> enabling statute, that statutory scheme may supply
> content for this rule of reason[.]"

Telecommunications Research & Action Ctr. v. F.C.C., 750 F.2d 70,

80 (D.C. Cir. 1984). The RCIA and AAPA provide just such a

"timetable or other indication of speed[.]" Id.[23]

Finally, the Government actually acknowledges that its duty

to eventually reach a decision on pending SIV applications is non-

discretionary. Gov't's Mot. at 36 ("[T]he only nondiscretionary

duty Defendants owed was to make a decision on the pending

---

[23] Our Court of Appeals has recommended that courts consider the
following complete list of factors: "(1) the time agencies take to
make decisions must be governed by a rule of reason; (2) where
Congress has provided a timetable or other indication of the speed
with which it expects the agency to proceed in the enabling
statute, that statutory scheme may supply content for this rule of
reason; (3) delays that might be reasonable in the sphere of
economic regulation are less tolerable when human health and
welfare are at stake; (4) the court should consider the effect of
expediting delayed action on agency activities of a higher or
competing priority; (5) the court should also take into account
the nature and extent of the interests prejudiced by delay; and
(6) the court need not find any impropriety lurking behind agency
lassitude in order to hold that agency action is unreasonably
delayed." Telecommunications Research & Action Ctr., 750 F.2d at
80 (internal quotation marks and citations omitted).

applications of Plaintiffs . . . to issue or refuse their visas, which they did.").

Nevertheless, the Government contends that the pace at which it adjudicates SIV applications is entirely discretionary, citing Beshir v. Holder, 10 F. Supp. 3d 165 (D.D.C. 2014) for support.

Admittedly, Beshir takes an expansive view of the Government's power to decide certain immigration applications on its own timeline. Beshir, 10 F. Supp. 3d at 174 (holding that "the pace of adjudication is discretionary"). However, the Beshir court based its conclusion on factors which are not present in this case. First, the Beshir court relied on "[t]he absence of a congressionally-imposed deadline or timeframe to complete the adjudication of [immigrant] adjustment [of status] applications [as] support[] [for] the conclusion that the pace of adjudication is discretionary and thus not reviewable[.]" Id. at 176. In the case at bar, Congress has provided a clear nine-month timeline for the adjudication of SIV applications.

Second Beshir relied on relevant statutory language permitting the Government to consider certain applications "in the Secretary [of Homeland Security] or the Attorney General's discretion and under such regulations as the Secretary or Attorney General may prescribe." Id. at 173 (quoting 8 U.S.C. § 1159(b)). The Government points to no similarly explicit grants of discretion

-55-

applicable to Plaintiffs' applications. Thus, the Beshir Court's reasoning is wholly inapplicable.[24]

The Government also contends that the pace of adjudication of SIV applications is discretionary because Congress provided for the possibility that "national security concerns" might cause some applications to require additional time. See RCIA § 1242(c)(2) ("Nothing in this section [which includes the nine-month timeline quoted above] shall be construed to limit the ability of [the] Secretary [of State and the Secretary of Homeland Security] to take longer than 9 months to complete those steps incidental to the issuance of such visas in high-risk cases for which satisfaction of national security concerns requires additional time."); see also AAPA § 602(4)(B) (same).

As the Government reads them, the statutes' mention of national security returns absolute discretion to the Government's hands. Gov't's Mot. at 34 ("But the nine-month timeline is not

---

[24] The Government points to Orlov v. Howard in support of its argument that the speed of application adjudication is discretionary, but that case also relies on the absence of a Congressionally-prescribed timeline, and therefore is also inapplicable. Orlov v. Howard, 523 F. Supp. 2d 30, 35 (D.D.C. 2007) ("In the absence of statutorily prescribed time limitations or statutory factors to guide USCIS in crafting regulations for the adjustment process, it is difficult to determine how the pace of processing an application could be anything other than discretionary.").

binding at any stage because the statute contemplates national security delays, which are inextricably intertwined with discretionary consular decisions. Delays related to national security can affect processing and timing at any stage, rendering the nine-month period merely aspirational.").

The RCIA and AAPA follow the same structure. Both statutes introduce the nine-month timeline and define its application in one paragraph and then introduce the safety valve for "high-risk cases" in the very next paragraph. RCIA § 1242(c) and AAPA § 602(b)(4). The statute sets forth that additional time may be permitted when national security issues arise. Obviously, Congress would not have adopted this rule-and-exception structure if it expected the exception to apply in every case. Moreover, the words "high-risk cases" indicate a distinction between the run-of-the-mill case, which must be adjudicated within nine months, and a subset of cases presenting "national security concerns" that do not arise in the typical application. RCIA § 1242(c); AAPA § 602(b)(4). The Government's reading would allow the national security exception to swallow the nine-month rule in its entirety.

Moreover, the presence of the national security exception does not eliminate the judicially-manageable standards described above. If the Government credibly claimed that a particular case was "high-risk" because it presented "national security

-57-

concerns[,]" RCIA § 1242(c)(2); AAPA § 602(b)(4)(B), a court should, of course, appropriately defer to the Government's expertise in the area of foreign policy and national security.

In this case, the Government has not even attempted to show that Plaintiffs' applications fall into the "high-risk" exception. To be sure, the Government has stated that national security concerns are present in this case, e.g., Gov't's Reply ("Nor does anything in [a particular case that Plaintiffs cite] address the direct question of national security interests, and terrorism-related considerations, that are unmistakably present in this case."), but the Government has never specified in any way what those concerns are.

The Government has suggested that because the applications of Charlie and Golf, named as Plaintiffs in the initial Complaint, were refused on terrorism-related grounds, the current Plaintiffs' applications are also suspect. Gov't's Reply at 1. However, the Government never even describes what relationship Charlie and Golf have to the other Plaintiffs that would cause such concern.

It is implied by the Government that "national security concerns," as the term is used in RCIA § 1242(c)(2) and AAPA § 602(b)(4)(B), are present in all SIV applications by Iraqis and Afghan citizens. But such an interpretation conflicts with Congress's statutory design. The RCIA applies only to SIV

-58-

applications by Iraqis, and the AAPA, likewise, applies <u>only</u> to applications by Afghans. If Iraqi or Afghan citizenship were enough to render an application "high-risk," the nine-month timeline would, again, be rendered a dead letter.

For all of these reasons, the Court concludes that adjudication of Plaintiffs' SIV applications within a reasonable time is non-discretionary, that judicially manageable standards exist to measure the Government's performance of its duty, and that the national security exception does not undermine these conclusions. Accordingly, the Court has subject matter jurisdiction to hear Plaintiffs' claims.

### 4.   The APA and the Mandamus Act

The APA, 5 U.S.C. § 706(1), authorizes the federal courts to "compel agency action unlawfully withheld or unreasonably delayed." The Supreme Court explained that § 706(1) "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing how it shall act.'" <u>Norton v. S. Utah Wilderness All.</u>, 542 U.S. 55, 64 (2004) (quoting Attorney General's Manual on the Administrative Procedure Act 108 (1947)).

Mandamus is "a drastic and extraordinary remedy reserved for really extraordinary causes." <u>Cheney v. U.S. Dist. Court for D.C.</u>, 542 U.S. 367, 380 (2004). The Mandamus Act, 28 U.S.C. § 1361,

provides district courts with jurisdiction to hear "action[s] in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Id. Courts may provide relief under the Act only when the plaintiff shows: (1) the defendant has a clear duty to act; (2) the plaintiff has a clear right to the relief he is seeking; and (3) the plaintiff has no other adequate remedy available. See Fornaro v. James, 416 F.3d 63, 69 (D.C. Cir. 2005).

The Government contends that Plaintiffs have failed to state a claim under either the APA or the Mandamus Act for reasons already rejected above: 1) that Plaintiffs' SIV applications have already been finally refused; 2) that the doctrine of consular nonreviewability bars their claims; and 3) that the nine-month timelines provided in the RCIA and AAPA are discretionary. See Gov't's Mot. at 27-36. The Government raised all these concerns in the context of its jurisdictional arguments, and in the sections above, the Court explains why none of them have merit: Plaintiffs' SIV applications await further action by the Government and have not been finally refused, see supra sections III.B.2.a. & c.; the doctrine of consular nonreviewability is inapplicable to Plaintiffs' claims, see supra section III.B.2.b.; and the duty to adjudicate Plaintiffs' applications within a reasonably period, as

informed by the nine-month timelines in the RCIA and AAPA is non-discretionary, see supra section III.B.3.

The Government also contends that Plaintiffs' claims must fail because any delays in processing their applications are "based on their own failures to submit all required to meet their burden to demonstrate visa eligibility, at various stages of the process." Gov't's Mot. at 34-35 (citing Dybdahl Decl.). This factual assertion directly conflicts with facts pled in Plaintiffs' Amended Complaint. See e.g. id. ¶ 7 ("Following the grant of COM Approval, each of the COM-Approved Plaintiffs duly completed all other steps required of them by the SIV application process."). The Court cannot consider the Government's conflicting factual assertion in a motion to dismiss for failure to state a claim. Aktieselskabet, 525 F.3d at 17 (a "court deciding a motion to dismiss must not make any judgment about the probability of the plaintiffs' success[, and] . . . must assume all the allegations in the complaint are true (even if doubtful in fact)").

For these reasons, Plaintiffs have properly stated their claims under the APA, 5 U.S.C. § 706(1), and the Mandamus Act, 28 U.S.C. § 1361.

## C.   Counts 1 & 2: Failure to Protect

RCIA § 1244(e) provides that "[t]he Secretary of State, in consultation with the heads of other relevant Federal agencies,

shall make a reasonable effort to provide an alien described in this section who is applying for a special immigrant visa with protection or the immediate removal from Iraq, if possible, of such alien if the Secretary determines after consultation that such alien is in imminent danger." AAPA § 602(b)(6) contains nearly identical language with respect to Afghan SIV applicants.

Plaintiffs contend that this passage gives rise to two related duties: "(1) [to] consult with the heads of other relevant Federal agencies to assess whether the threats faced by Plaintiffs are imminent; and, if so, (2) make a reasonable effort to provide protection or the immediate removal of Plaintiffs from such threats, if possible." Pls.' Opp'n at 28. Counts 1 and 2 of Plaintiffs' Amended Complaint allege that Defendants have failed to fulfil these duties. Am. Compl. ¶¶ 205-218.

As already discussed, the APA empowers reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).[25] Citing § 706, Plaintiffs ask the

---

[25] Plaintiffs' Amended Complaint also cites the APA's grant of judicial authority "[to] hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." Amended Compl. ¶¶ 209, 216 (quoting 5 U.S.C. § 706(2)). However, Plaintiffs' Opposition relies only on § 706(1) to rebut the Government's arguments in favor of dismissing Counts 1 and 2.

Court to compel Defendants to undertake the duties described in RCIA § 1244(e) and AAPA § 602(b)(6).

The Government contends that this Court is without jurisdiction to hear Claims 1 and 2.[26] The Court agrees for the following reasons.

"[A] claim under section 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." People for the Ethical Treatment of Animals v. U.S. Dep't of Agric., 797 F.3d 1087, 1098 (D.C. Cir. 2015) (emphasis and brackets omitted) (quoting Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 64 (2004)). Moreover, the APA expressly precludes judicial review of agency action that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Agency action is committed to agency discretion by law when "the statute is drawn so that a court would have no meaningful standard

---

[26] The Government also contends -- for the first time in its Reply brief -- that Plaintiffs lack standing to assert claims under RCIA § 1244(e) and AAPA § 602(b)(6) because these provisions contemplate individuals with unadjudicated SIV applications, and Plaintiffs' applications have been finally refused. Ordinarily, an argument not raised in an opening brief is forfeited, Am. Wildlands v. Kempthorne, 530 F.3d 991, 1001 (D.C. Cir. 2008), but because Plaintiffs' lack of standing would deprive this Court of jurisdiction, the Court must consider the question. Fed. R. Civ. P. 12(h)(3); Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 435 (2011). However, the question is easily answered: As the Court concludes below, Plaintiffs' applications have not been finally adjudicated, so the Government's late challenge to Plaintiffs' standing fails.

against which to judge the agency's exercise of discretion[.]"
Sierra Club v. Jackson, 648 F.3d 848, 855 (D.C. Cir. 2011) (quoting
Heckler v. Chaney, 470 U.S. 821, 830 (1984)). If no "judicially
manageable standard" exists by which to judge the agency's action,
meaningful judicial review is unavailable under the APA. Id.

The statutory duties that Plaintiffs cite are of the type
described in Sierra Club. Plaintiffs point to no standards by which
the Court could assess whether Defendants have adequately assessed
the dangers that Plaintiffs face.

The language of RCIA § 1244(e) and AAPA § 602(b)(6) strongly
indicates that significant discretion has been left to the
Secretary of State as to how to carry out his mandate. Under the
statutes the Secretary "shall make a reasonable effort" to provide
protection or removal to SIV applicants. Id. What efforts are
reasonable will depend upon "complex concerns involving security
and diplomacy" far beyond the expertise of the Court -- but
squarely within that of the Secretary. Legal Assistance for
Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular
Affairs, 104 F.3d 1349, 1353 (D.C. Cir. 1997). In addition,
Plaintiffs fail to point to any standards by which the Court may
assess whether Plaintiffs are in "imminent danger" or whether the
Secretary has adequately acted "in consultation with the heads of

-64-

other relevant Federal agencies." RCIA § 1245(e); AAPA § 602(b)(6).

True, the RCIA and AAPA both use the word "shall," which generally indicates an "affirmative command." See Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 661 (2007) ("The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive" (internal citations omitted)). But Congress surrounded "shall" with a profusion of other words that connote discretion:

> The Secretary . . . shall make a <u>reasonable effort</u> to provide an alien described in this section who is applying for a special immigrant visa with <u>protection or the immediate removal</u> from Iraq, <u>if possible</u>, of such alien <u>if the Secretary determines</u> after consultation that such alien is in <u>imminent</u> danger.

RCIA § 1245(e) (emphasis added); <u>accord</u> AAPA § 602(b)(6).

In order to enforce the statute's command, the Court would have to (1) assess whether the Secretary's efforts were "reasonable", (2) decide whether any efforts other than removal would provide sufficient "protection", (3) determine whether protection or removal were "possible," and (4) pass judgment on the Secretary's final "determin[ation]" about the imminence of any danger facing a particular SIV applicant. Id. Plaintiff points to no standards by which the Court might assess these decisions.

whether and how to protect or remove SIV applicants from their countries) are themselves discretionary.

In short, under RCIA § 1244(e) and AAPA § 602(b)(6), "the agency is entrusted by a broadly worded statute with balancing complex concerns involving security and diplomacy" that are "peculiarly with the agency's expertise[.]" <u>Vietnamese Asylum Seekers</u>, 104 F.3d at 1353. Counts 1 and 2 of Plaintiffs' Amended Complaint must be dismissed.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to File a Supplemental Declaration shall be **granted**, and the Government's Motion to Dismiss shall be **granted with respect to Counts 1 & 2** and **denied with respect to Counts 3-6** (except insofar as those claims relate to Alpha, Bravo, and Delta). Accordingly, **Counts 1 & 2 shall be dismissed** and **Alpha, Bravo, and Delta's claims shall be dismissed as moot**.

January 28, 2016
Gladys Kessler
United States District Judge

**Copies to:** attorneys on record via ECF